IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

GEORGE EGAN AND          )
DIANE EGAN,              )
                        )
          Plaintiffs,    )          CIVIL ACTION FILE NO. __3:15-3533-TLW__
                        )
v.                      )
                        )
UNITED STATES OF AMERICA,  )
                        )
          Defendant.     )
                        )
_____)

## COMPLAINT

Plaintiffs George Egan ("Mr. Egan") and Diane Egan ("Mrs. Egan") allege:

1.

This is an action arising under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et. seq.
This Court is vested with jurisdiction pursuant to 28 U.S.C. § 1346(b).

2.

Plaintiffs' place of residence is in Newberry County, South Carolina.

3.

At all times mentioned herein, Defendant United States of America, through its agency
the Department of Veterans Affairs (the "VA"), owned and operated William Jennings Bryan
Dorn Veterans Administration Medical Center in Columbia, South Carolina (the "Columbia
VAMC").

4.

The events or omissions giving rise to this cause of action occurred at the Columbia
VAMC in this district.

5.

Timely and adequate administrative claim notices were sent to and received by the Office of Regional Counsel, Department of Veterans Affairs, regarding the claims made herein.

6.

Notice of the denial of Plaintiffs' claims was sent to Plaintiffs on July 30, 2014.

7.

Plaintiffs timely submitted a request for reconsideration of the denial of Plaintiffs' claims, which the Office of Regional Counsel, Department of Veterans Affairs received on December 29, 2014.  To date, Plaintiffs have not received a response to the request for reconsideration.  More than six months have passed since the submission of the request for reconsideration, and Plaintiffs are authorized to file this lawsuit pursuant to 28 U.S.C.A. § 2675.

8.

Mrs. Egan has been married to Mr. Egan since March 22, 2005.

9.

Mr. Egan is an honorably discharged veteran of the United States Army who served in the Vietnam War.  His medals and commendations include the Purple Heart for extreme valor.

10.

While serving in the Vietnam War, Mr. Egan was involved in a helicopter crash in 1966 and suffered an injury to his back.  Over the subsequent years, he sought treatment for his back injury and other service related injuries at Veterans Administration facilities.

11.

On October 25, 2010, Mr. Egan underwent an MRI of his lumbar spine at the Columbia VAMC ordered by Mr. Egan's primary care physician at the Columbia VAMC, Dr. Emmet Maas ("Dr. Maas"), as part of his evaluation of Mr. Egan's ongoing lower back pain. The MRI findings included severe thecal sac compression at the L2-3 level from a large disc extrusion, and degenerative central canal stenosis involving the lumbar intervertebral nerve root canals bilaterally at the L2-L3 and L5-S1 levels.

12.

Dr. Maas was an employee or agent of the Columbia VAMC and acted within the course and scope of his employment at all times during his involvement in Mr. Egan's medical care,

13.

Following the October 25, 2010 MRI, Dr. Maas referred Mr. Egan to the pain management clinic at the Columbia VAMC for treatment for his ongoing lower back pain.

14.

Medical providers at the Columbia VAMC pain management clinic including Casey Dellabarca, M.D. ("Dr. Dellabarca"), Amit Singh, M.D. ("Dr. Singh"), and a physician assistant named Eileen Rogers ("Ms. Rogers") attempted to treat Mr. Egan's back pain between January 3, 2011 and February 7, 2012.

15.

Dr. Dellabarca, Dr. Singh, and Ms. Rogers were employees or agents of the Columbia VAMC and acted within the course and scope of their employment at all times during their involvement in Mr. Egan's medical care.

16.

Dr. Singh performed epidural steroid injections ("ESIs") on Mr. Egan on January 18, March 21, and November 9, 2011.  He performed right medial branch blocks and a dorsal primary ramus block at L5, on December 7, 2011.

17.

In addition to undergoing the procedures referenced above in Paragraph 16, Mr. Egan was prescribed medications for his lower back pain including Gabapentin and Baclofen.

18.

Mr. Egan's medical records from the Columbia VAMC pain management clinic show that he reported to Ms. Rogers that the ESI performed on November 9, 2011 provided no relief of his lower back pain, and that the block injections which Dr. Singh performed on December 7, 2011 only provided approximately twenty-five percent relief for approximately four weeks.

19.

The medical record from a February 7, 2012 visit to the pain management clinic notes that Mr. Egan reported his lower back pain was eight out of ten, and that the pain traveled to his right buttock, hip and thigh in an L5/S1 pattern.  Mr. Egan described the pain as "throbbing, hot-burning, aching."  The "Plan" portion of the record includes notes that "[p]er Dr. Singh [Mr. Egan] [was] not a good [minimally invasive lumbar discectomy] candidate", and that Mr. Egan was to return in two months to reconsider injections.

20.

Dr. Maas received the record from Mr. Egan's February 7, 2012 visit to the pain management clinic on or around 14:23 on February 7, 2012.

21.

Based on the persistence of Mr. Egan's radiating lower back pain despite the ESIs, block injections, medications, and other conservative treatments documented in Mr. Egan's medical records, Dr. Dellabarca, Dr. Singh, and/or Dr. Maas should have requested a consultation by a neurosurgeon, orthopedic spine surgeon, or neurologist to determine whether Mr. Egan was a candidate for spinal decompression surgery.

22.

Neither Dr. Maas nor any of the physicians who treated Mr. Egan at the Columbia VAMC pain management clinic ever requested a consultation with a neurosurgeon, orthopedic spine surgeon, or neurologist to address whether Mr. Egan was a candidate for spinal decompression surgery.

23.

On February 19, 2012, Mr. Egan presented to the emergency department at the Columbia VAMC with complaints about his lower back pain. He was diagnosed with "acute on chronic low back pain with sciatica, right", and discharged home.

24.

On February 21, 2012, Mr. Egan returned to the emergency department at the Columbia VAMC and complained of worsening lower back pain that radiated down both of his legs. He reported that he was unable to stand and did not suffer urinary or bowel incontinence. He was admitted to the hospital.

25.

Amy Lucas, M.D. ("Dr. Lucas"), Myron Kung, M.D. ("Dr. Kung"), Karin Jenkins, M.D. ("Dr. Jenkins"), and a nurse practitioner named Mary Gustafson ("Ms. Gustafson")

were involved in Mr. Egan's care between his admission to the Columbia VAMC on February 21, 2012 and February 24, 2012.

26.

Dr. Lucas, Dr. Kung, Dr. Jenkins, and Ms. Gustafson were employees or agents of the Columbia VAMC and acted within the course and scope of their employment at all times during their involvement in Mr. Egan's medical care,

27.

Mr. Egan underwent an MRI of his lumbar spine on February 23, 2012.  The MRI report includes the findings that "[t]he current study has not significantly changed from the prior MRI scan of the lumbar spine dated 10/25/10.  There is again noted to be high grade central canal stenosis at the L2-3 level due to large disc extrusion."

28.

Mr. Egan's medical records from the Columbia VAMC note that between his admission and February 24, 2014, Mr. Egan reported to medical providers that his legs had given out multiple times while walking and that he had poor control of his legs.

29.

On February 23, 2012, Mr. Egan's Baclofen was increased to 20 mg three times a day, and his Gabapentin was increased to 800 mg three times a day.

30.

Over the course of their involvement in Mr. Egan's care, Dr. Lucas, Dr. Kung, and Dr. Jenkins were aware of Mr. Egan's reports that his legs had given out multiple times while walking and that he had poor control of his legs, as well as his complaint of radiating lower back pain.

31.

The report from the October 25, 2010 lumbar spine MRI detailing the findings described above in Paragraph 11 was available for Dr. Lucas, Dr. Kung, Dr. Jenkins, and any other physician involved in Mr. Egan's care between February 21 and February 24, 2012 to review.

32.

Mr. Egan's medical records reflecting the pre-admission treatment he received for his lower back pain at the Columbia VAMC were available for Dr. Lucas, Dr. Kung, Dr. Jenkins, and any other physician involved in Mr. Egan's care between February 21 and February 24, 2012 to review.

33.

The combination of Mr. Egan's documented symptoms between February 21 and February 24, 2012, the history of his lower back pain and symptoms leading up to his admission as documented in his pre-admission medical records from the Columbia VAMC, and the findings from the October 25, 2010 and February 23, 2012 lumbar spine MRIs were highly suspicious for cauda equina syndrome, and required a consultation by a neurosurgeon, orthopedic spine surgeon, or neurologist on a "STAT" or urgent basis.

34.

During her involvement in Mr. Egan's medical care, Dr. Lucas neither included cauda equina syndrome in any differential diagnosis that she worked up for Mr. Egan, nor requested a consultation from a neurosurgeon, orthopedic spine surgeon, or neurologist to evaluate Mr. Egan for possible cauda equina syndrome.

35.

During his involvement in Mr. Egan's medical care, Dr. Kung neither included cauda equina syndrome in any differential diagnosis that he worked up for Mr. Egan, nor requested a consultation from a neurosurgeon, orthopedic spine surgeon, or neurologist to evaluate Mr. Egan for possible cauda equina syndrome.

36.

During her involvement in Mr. Egan's medical care, Dr. Jenkins neither included cauda equina syndrome in any differential diagnosis that she worked up for Mr. Egan nor requested a consultation from a neurosurgeon, orthopedic spine surgeon, or neurologist to evaluate Mr. Egan for possible cauda equina syndrome.

37.

Mr. Egan's medical records note that he suffered delirium on February 24, 2012, which was suspected to be secondary to the increase in his medications.  According to Mr. Egan's medical records, he was transferred to the medical intensive care unit ("MICU") at the Columbia VAMC for sedation and intubation so that he would remain still for a head CT.

38.

Mr. Egan's medical records state that his lower extremity strength was 5/5 on February 24, 2012 before he was transferred to the MICU.

39.

Mr. Egan remained in the MICU from February 24 through March 26, 2012.  He was extubated on March 7, 2012.

40.

An internal medicine resident named Ashley Wilson, M.D. ("Dr. Wilson") was involved in Mr. Egan's care during his admission to the MICU.

41.

An attending physician named William Ghent, M.D. ("Dr. Ghent") supervised Dr. Wilson during her involvement in Mr. Egan's medical care.

42.

Dr. Wilson and Dr. Ghent were employees or agents of the Columbia VAMC and acted within the course and scope of their employment at all times during their involvement in Mr. Egan's medical care.

43.

As Dr. Wilson's supervising physician, Dr. Ghent was responsible for Dr. Wilson's care and treatment of Mr. Egan over the course of her involvement in Mr. Egan's medical care.

44.

The medical records from Mr. Egan's admission through his transfer to the MICU, including the report and findings from the February 23, 2012 MRI, were available to Dr. Wilson and Dr. Ghent to review over the course of their involvement in Mr. Egan's care.

45.

Mr. Egan's pre-admission medical records reflecting the treatment he received for his lower back pain from providers at the Columbia VAMC including the providers at the pain management clinic and Dr. Maas, as well as the report from the October 25, 2010 lumbar spine

MRI, were available for Dr. Wilson and Dr. Ghent to review over the course of their involvement in Mr. Egan's medical care.

46.

During the course of her involvement in Mr. Egan's medical care, Dr. Wilson neither included cauda equina syndrome in any differential diagnosis that she worked up for Mr. Egan, nor ordered a consultation by a neurosurgeon, orthopedic spine surgeon, or neurologist to evaluate Mr. Egan for possible cauda equina syndrome.

47.

During the course of his involvement in Mr. Egan's medical care, Dr. Ghent neither included cauda equina syndrome in any differential diagnosis that he worked up for Mr. Egan, nor ordered a consultation by a neurosurgeon, orthopedic spine surgeon, or neurologist to evaluate Mr. Egan for possible cauda equina syndrome.

48.

A neurologist, Ann Hawes, M.D. ("Dr. Hawes"), saw Mr. Egan on February 27, March 5, March 8, and March 9, 2012. During her involvement in Mr. Egan's care, Dr. Hawes focused on diagnosing the cause of and/or treating Mr. Egan's delirium, and did not evaluate Mr. Egan for possible cauda equina syndrome.

49.

Dr. Hawes was an employee or agent of the Columbia VAMC at all times during her involvement in Mr. Egan's medical care.

50.

The medical records from Mr. Egan's admission through his transfer to the MICU, including the report and findings from the February 23, 2012 MRI, were available to Dr. Hawes to review over the course of her involvement in Mr. Egan's care.

51.

Mr. Egan's pre-admission medical records reflecting the treatment he received for his lower back pain from providers at the Columbia VAMC including the providers at the pain management clinic and Dr. Maas, as well as the report from the October 25, 2010 lumbar spine MRI, were available for Dr. Hawes to review over the course of her involvement in Mr. Egan's medical care.

52.

Over the course of her involvement in Mr. Egan's medical care, Dr. Hawes neither included cauda equina syndrome in any differential diagnosis that she worked up for Mr. Egan, nor ordered a consultation by a neurosurgeon or orthopedic spine surgeon to evaluate Mr. Egan for possible cauda equina syndrome.

53.

A resident at the Columbia VAMC, Odette Anderson, M.D. ("Dr. Anderson"), performed a neurology consultation on Mr. Egan on March 13.  The neurology consultation was not requested to evaluate Mr. Egan for possible cauda equine syndrome.

54.

Dr. Anderson was an employee or agent of the Columbia VAMC at all times during her involvement in Mr. Egan's medical care.

- 11 -

55.

Dr. Anderson worked under the supervision of attending neurologists employed by the Columbia VAMC at all times during her involvement in Mr. Egan's medical care.

56.

Dr. Anderson charted in the record from the March 13, 2012 consultation that Mr. Egan was admitted for evaluation and treatment of back pain.  Additionally, Dr. Anderson charted the following findings from examinations that she performed on Mr. Egan:  1/5 bilateral lower extremity strength; mostly flacid muscle tone; zero bilateral patellar and Achilles reflexes; no plantar response to a Babinski test, and equally decreased sensation in his bilateral lower extremities.

57.

Dr. Andersons' plan for Mr. Egan as charted in the record from the March 13, 2012 consultation includes the statement that Mr. Egan "needs to be mobilized and getting up.  PT eval and treatment regarding getting up with weight bearing."

58.

A neurologist employed at the Columbia VAMC, John Steedman, M.D. ("Dr. Steedman"), supervised Dr. Anderson when she performed the March 13, 2012 neurology consultation, and was aware of the findings detailed above in Paragraph 56.

59.

Dr. Steedman was an employee or agent of the Columbia VAMC and acted within the course and scope of his employment or agency at all relevant times during his involvement in Mr. Egan's medical care.

60.

As Dr. Anderson's supervising physician on March 13, 2012, Dr. Steedman was responsible for Dr. Anderson's care and treatment of Mr. Egan over the course of her involvement in Mr. Egan's care on that date.

61.

The medical records from Mr. Egan's admission through his transfer to the MICU, including the report and findings from the February 23, 2012 MRI, were available to Dr. Anderson and Dr. Steedman to review over the course of their involvement in Mr. Egan's care.

62.

Mr. Egan's pre-admission medical records reflecting the treatment he received for his lower back pain from providers at the Columbia VAMC, including his treatment records from the pain management clinic and Dr. Maas, as well as the report from the October 25, 2010 lumbar spine MRI, were available for Dr. Anderson and Dr. Steedman to review over the course of their involvement in Mr. Egan's medical care.

63.

The combination of Dr. Anderson's findings of decreased lower extremity strength and sensation in Mr. Egan's lower extremities during the March 13, 2012 consultation, Mr. Egan's documented symptoms between February 21 and February 24, 2012, the history of his lower back pain and symptoms leading up to his admission as documented in his medical records from the Columbia VAMC, and the findings from the October 25, 2010 and February 23, 2012 lumbar spine MRIs, were highly suspicious for progressively worsening cauda equina syndrome requiring a consultation by a neurosurgeon or orthopedic spine surgeon on a "STAT" or urgent basis.

64.

Over the course of her involvement in Mr. Egan's medical care, Dr. Anderson neither included progressively worsening cauda equine syndrome in any differential diagnosis that she worked up for Mr. Egan, nor order a consultation by a neurosurgeon or orthopedic spine surgeon to evaluate Mr. Egan for progressively worsening cauda equina syndrome.

65.

Over the course of his involvement in Mr. Egan's medical care, Dr. Steedman neither included progressively worsening cauda equina syndrome in any differential diagnosis that he worked up for Mr. Egan, nor ordered a consultation by a neurosurgeon or orthopedic spine surgeon to evaluate Mr. Egan for possible cauda equina syndrome.

66.

Various internists including Brown McCallum, M.D. ("Dr. McCallum") and an internal medicine resident, Ashley Primus, M.D. ("Dr. Primus"), were involved in Mr. Egan's care in the MICU at the Columbia VAMC between Dr. Anderson's March 13, 2012 consultation and Mr. Egan's discharge from the MICU on April 3, 2012.

67.

Dr. McCallum and Dr. Primus were employees or agents of the Columbia VAMC and acted within the course and scope of their employment or agency at all times during their involvement in Mr. Egan's medical care,

68.

Dr. Primus worked under the supervision of Dr. McCallum and/or other medical providers employed at the Columbia VAMC at all times during her involvement in Mr. Egan's medical care.

69.

The medical records from Mr. Egan's admission through his transfer to the MICU, including the report and findings from the February 23, 2012 MRI, and the records from his admission to the MICU, including Dr. Anderson's March 13, 2012 neurology consultation, were available to Dr. McCallum and Dr. Primus to review over the course of their involvement in Mr. Egan's care.

70.

Mr. Egan's pre-admission medical records reflecting the treatment he received for his lower back pain from providers at the Columbia VAMC including the providers at the pain management clinic and Dr. Maas, as well as the report from the October 25, 2010 lumbar spine MRI, were available for Dr. McCallum and Dr. Primus to review over the course of their involvement in Mr. Egan's medical care.

71.

Over the course of his involvement in Mr. Egan's medical care, Dr. McCallum neither included progressively worsening cauda equina syndrome in any differential diagnosis that he worked up for Mr. Egan, nor ordered a consultation by a neurosurgeon, orthopedic spine surgeon, or neurologist to evaluate Mr. Egan for progressively worsening cauda equina syndrome.

72.

Over the course of her involvement in Mr. Egan's medical care, Dr. Primus neither included progressively worsening cauda equina syndrome in any differential diagnosis she worked up for Mr. Egan, nor ordered a consultation by a neurosurgeon or orthopedic spine surgeon to work up Mr. Egan for progressively worsening cauda equina syndrome.

73.

On April 3, 2012, an internist at the Columbia VAMC, Joseph Thompson, M.D. ("Dr. Thompson"), evaluated Mr. Egan prior to Mr. Egan being transferred to a rehabilitation facility named "CLC Congaree", which was part of the Columbia VAMC.

74.

Dr. Thompson was an employee or agent of the Columbia VAMC and worked within the course and scope of his employment or agency at all times during his involvement in Mr. Egan's medical care.

75.

The information charted by Dr. Thompson in the record from his April 3, 2012 evaluation included the following:  Mr. Egan was admitted for back pain, had residual "weakness/neuropathy of legs"; had high grade central canal stenosis at L2-L3 due to disc extrusion; had a "history of many pain clinic visits with lumbar radiculitis, lumbar facet syndrome, s/p lumbar epidural injections in 2011 with limited, short term benefit"; had not been seen by neurosurgery; was incontinent of stool; was wearing a urine soaked adult diaper; had very weak quadriceps muscles bilaterally, with 2/5 strength in the right quadriceps and 3/5 muscle strength in the left quadriceps, did not have ankle flexion or extension, had poor sensation in his feet; had no response to plantar stimulation, and had no knee reflexes.

76.

Dr. Thompson charted in the record for the April 3, 2012 evaluation that he would ask neurology to see Mr. Egan "since there is a concern about neuropathy and extreme weakness in flexors/extensors in ankles.  [N]eeds emg?"

77.

The medical records from Mr. Egan's admission through his transfer to the MICU, including the report and findings from the February 23, 2012 MRI, and the records from his admission to the MICU, including Dr. Anderson's March 13, 2012 neurology consultation, were available to Dr. Thompson to review over the course of his involvement in Mr. Egan's medical care.

78.

Mr. Egan's pre-admission medical records reflecting the treatment he received for his lower back pain from providers at the Columbia VAMC, including his treatment records from the pain management clinic and Dr. Maas, as well as the report from the October 25, 2010 lumbar spine MRI, were available for Dr. McCallum and Dr. Primus to review during the course of their involvement in Mr. Egan's medical care.

79.

The combination of the findings that Dr. Thompson charted in the record for the April 3, 2012 evaluation, which are detailed above in Paragraph 75, Dr. Anderson's findings of decreased lower extremity strength and sensation in Mr. Egan's lower extremities during the March 13, 2012 consultation, Mr. Egan's documented symptoms between February 21 and February 24, 2012, the history of his lower back pain and symptoms leading up to his admission as documented in his medical records from the Columbia VAMC, and the findings from the

- 17 -

October 25, 2010 and February 23, 2012 lumbar spine MRIs were highly suspicious for progressively worsening cauda equina syndrome requiring a consultation by a neurosurgeon, orthopedic spine surgeon, or neurologist on a "STAT" or urgent basis.

80.

Over the course of his involvement in Mr. Egan's medical care, Dr. Thompson neither included progressively worsening cauda equina syndrome in any differential diagnosis that he worked up for Mr. Egan, nor ordered a consultation by a neurosurgeon or orthopedic spine surgeon to evaluate Mr. Egan for progressively worsening cauda equina syndrome.

81.

On April 3, 2012, Mr. Egan was transferred to the CLC Congaree facility for short term rehabilitation and, that same day underwent an admission history and physical by a nurse practitioner named Barbara Fuchs ("Ms. Fuchs").

82.

At all times during her involvement in Mr. Egan's medical care, Ms. Fuchs was an employee or agent of the Columbia VAMC and worked within the course and scope of her employment or agency.

83.

The information charted by Ms. Fuchs in the record for the April 3, 2012 admission history and physical included the following:  Mr. Egan needed short term rehabilitation because he was deconditioned; he was admitted to the Columbia VAMC with a history of chronic lower back pain and MRI findings of high grade central canal stenosis at L2-3 due to a large disc extrusion; he was admitted to the Columbia VAMC with a complaint of worsening back pain with radiation; he was bladder and bowel incontinent; he had radicular syndrome in his lower

legs; he had an abnormal gait; he had decreased sensation in his lower extremities; he had weak

quadriceps muscles bilaterally, with 2/5 strength in the right quadriceps and 3/5 strength in the

left quadriceps; he had no ankle flexion or extension; had poor sensation in his feet; that his toes

had no response to plantar stimulation; he had no knee reflexes; and that a neurology consult had

been requested.

84.

Dr. Thompson cosigned Ms. Fuch's April 3, 2012 admission history and physical note at

11:43 a.m. on April 4, 2012 and either was or should have been aware of the findings

documented therein.

85.

On April 4, 2012, Dr. Anderson performed a neurology consult on Mr. Egan to evaluate

Mr. Egan's lower extremity weakness.  She assessed Mr. Egan with critical illness

polyneuropathy.  She acknowledged that lumbar stenosis and the large disc extrusion shown on

the October 25, 2010 and February 23, 2012 lumbar spine MRI's likely played a role in Mr.

Egan's lower extremity weakness. She also charted that she expected a good prognosis "with

treatment of any underlying causes and with rehab; e.g. physical therapy."

86.

Dr. Anderson's plan following the April 4, 2012 consultation was for Mr. Egan to

undergo a neurosurgery consultation on a routine or non-urgent basis and an electromyography

study ("EMG").

87.

A neurologist at the Columbia VAMC, Yedatore Vankatesh, M.D. ("Dr. Venkatesh"),

cosigned and added an addendum to the record for Dr. Anderson's April 4, 2012 consultation,

and was Dr. Anderson's attending or supervising physician when she performed the April 4, 2012 neurology consultation.

88.

At all times during his involvement in Mr. Egan's medical care, Dr. Vankatesh was an employee or agent of the Columbia VAMC and acted within the course and scope of his employment or agency.

89.

As supervising attending physician of Dr. Anderson, Dr. Venkatesh was responsible for Dr. Anderson's care and treatment of Mr. Egan on April 4, 2012.

90.

The medical records from Mr. Egan's admission through his transfer to the MICU, including the report and findings from the February 23, 2012 MRI, the records from his admission to the MICU, including the record from Dr. Thompson's April 3, 2012 evaluation and the record from Ms. Fuch's April 3, 2012 admission history and physical, were available to Dr. Anderson and Dr. Venkatesh to review at the time that Dr. Anderson performed the April 4, 2012 neurology consultation.

91.

Mr. Egan's pre-admission medical records reflecting the treatment he received for his lower back pain from providers at the Columbia VAMC, including his treatment records from the pain management clinic and Dr. Maas, as well as the report from the October 25, 2010 lumbar spine MRI, were available for Dr. Anderson and Dr. Venkatesh to review at the time that Dr. Anderson performed the April 4, 2012 neurology consultation.

92.

Based on the information in Mr. Egan's medical records available to Dr. Anderson and
Dr. Venkatesh at the time that Dr. Anderson performed the April 4, 2012 neurology consultation,
Dr. Venkatesh and Dr. Anderson should have included progressively worsening cauda equina
syndrome in any differential diagnosis that they worked up for Mr. Egan and ordered a
consultation with a neurosurgeon or orthopedic spine surgeon on a "STAT" or urgent basis.

93.

Following the April 4, 2012 neurology consultation, Dr. Anderson neither included
progressively worsening cauda equina syndrome in any differential diagnosis that she worked up
for Mr. Egan, nor ordered a consultation by a neurosurgeon or orthopedic spine surgeon to
evaluate Mr. Egan for progressively worsening cauda equina syndrome on a "STAT" or urgent
basis.

94.

Following the April 4, 2012 neurology consultation, Dr. Venkatesh neither included
progressively worsening cauda equina syndrome in any differential diagnosis that he worked up
for Mr. Egan, nor ordered a consultation by a neurosurgeon or orthopedic spine surgeon to
evaluate Mr. Egan for progressively worsening cauda equina syndrome on a "STAT" or urgent
basis.

95.

On April 10, 2012, Dr. Thompson charted that the EMG study, which was recommended
by Dr. Anderson during the April 4, 2012 neurology consult, was not scheduled to be conducted
until May 11, 2012.  Additionally, Dr. Thompson charted that he left a voicemail with Demerise
Minor ("Ms. Minor"), a nurse practitioner in the Columbia VAMC's neurosurgery department,

about the elective neurosurgery consultation that Dr. Anderson recommended during the April 4th neurology consultation.

96.

Ms. Minor subsequently performed a neurosurgery consultation on Mr. Egan at some time in the afternoon of April 10, 2012.  Ms. Minor included the following information in the record for the consultation:  Mr. Egan was admitted with severe back pain and was not bowel or bladder incontinent at the time of admission; a prior MRI showed a large disc extrusion at L2-L3; Mr. Egan was unable to perform activities of daily living and could not stand or walk at the time of the consultation; he was bowel and bladder incontinent at the time of the consultation; and he had impaired sensation to light touch/pin prick in his ankles.

97.

Ms. Minor's impression from the April 10, 2012 neurosurgery consultation was that Mr. Egan had "cauda equina syndrome with large disc at L2-3 with most of the cord obliterated." Ms. Minor's plan was for Mr. Egan to be transferred to a neurosurgeon at a non-VA hospital the following day.

98.

On April 12, 2012, Mr. Egan underwent decompression surgery characterized as a lumbar laminectomy at L2-L3, at a non-VA hospital.  However, due to the prolonged delay in both diagnosing Mr. Egan's cauda equina syndrome and referring him to a neurosurgeon or orthopedic spine surgeon during his admission at the Columbia VAMC, the surgery was not successful in restoring Mr. Egan's neurological strength or function below his waist.

99.

Mr. Egan currently suffers permanent paralysis below the waist, bowel and bladder

incontinence, and sexual dysfunction.

100.

The affidavits of Neil J. Farber, M.D., Don F. Mills, M.D., Barry Ludwig, M.D., and

Kaveh Khajavi, M.D., are attached hereto as Exhibits "1" through "4", respectively, pursuant to

S.C. ST § 15-36-100, and are incorporated herein by reference.  Said affidavits set forth at least

one negligent act or omission by Defendant via its employees and/or agents and/or the direct and

proximate result of those negligent acts or omissions with regard to Mr. Egan.

101.

As described herein and in the affidavits attached hereto as Exhibit "1" and  Exhibit "4",

the care and treatment, or lack thereof, which Dr. Maas rendered to Mr. Egan fell below that

degree of skill and care ordinarily employed by physicians generally under similar conditions

and like circumstances, and caused Mr. Egan's injuries.

101.

As described herein and in the affidavits attached hereto as Exhibit "2" and Exhibit "4",

the care and treatment, or lack thereof, which the physicians at the Columbia VAMC's pain

management clinic rendered to Mr. Egan fell below that degree of skill and care ordinarily

employed by physicians generally under similar conditions and like circumstances, and caused

Mr. Egan's injuries.

102.

As described herein and in the affidavits attached hereto as Exhibit "1", Exhibit "3", and

Exhibit "4", the care and treatment, or lack thereof, which the physicians at the Columbia

VAMC rendered to Mr. Egan during his February 21 through April 11, 2012 admission fell

below that degree of skill and care ordinarily employed by physicians generally under similar conditions and like circumstances, and caused Mr. Egan's injuries.

103.

As described herein and in the affidavits attached hereto as Exhibit "1", Exhibit "3", and Exhibit "4", Dr. Maas, as well as the physicians at the Columbia VAMC who were involved in Mr. Egan's medical care during the February 21st through April 11, 2012 admission, failed to exercise even slight care and acted with indifference to the consequences during their involvement in Mr. Egan's medical care, and are liable for gross negligence.

104.

As a direct and proximate result of the negligence and gross negligence of Defendant's employees and/or agents, Mr. Egan:  (a) suffers permanent paralysis below the waist and loss of bowel, bladder, and sexual function; (b) endured and will continue to endure pain and suffering; (c) requires extensive medical and nursing care which he will require for the remainder of his life.

105.

As a direct and proximate result of the negligence and gross negligence of Defendant's agents and employees, Plaintiff Diane Egan has been and will continue to be deprived of her husband's consortium, companionship and services.

WHEREFORE, Plaintiffs pray:

(a)     That judgment be entered in favor of Plaintiff George Egan against Defendant in an amount sufficient to compensate Mr. Egan for his pain and suffering, and future anticipated medical and related expenses; and

(b)    That judgment be entered in favor of Plaintiff Diane Egan in an amount sufficient

to compensate her for her loss of her husband's consortium, companionship and services;  and

(c)    That Plaintiffs have such other relief as the Court may deem proper.

**KASSEL MCVEY**

<u>s/ John D. Kassel</u>
John Kassel
South Carolina Bar No. 2278
Theile B. McVey
South Carolina Bar No. 7614

P.O. Box 1476
Columbia, South Carolina 29202
803.256.42.42
jkassel@kassellaw.com

**ATTORNEYS FOR PLAINTIFFS**